UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ELISHA A. D.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:22-cv-02116-GCS |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI of the Act.

### PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on January 3, 2019. (Tr. 23, 248). However, Plaintiff's claims were unsuccessful, both initially and on reconsideration. *Id.* After reconsideration, Defendant issued a Notice of Disapproved Claims dated February 24, 2020. (Tr. 23, 199). On May 29, 2020, Plaintiff filed a timely Request for Hearing by Administrative Law Judge ("ALJ"). (Tr. 20, 205). After a hearing, ALJ Lisa

---

[1]   In keeping with the court's usual practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

Leslie issued an unfavorable decision dated November 17, 2021. (Tr. 20-46). On January 11, 2022, Plaintiff filed a request for review of the hearing decision/order with Defendant agency's Appeals Council. (Tr. 347). On July 11, 2022, the Appeals Council denied review, thus making the decision of the ALJ the final decision of the Commissioner of Social Security. (Tr. 1).

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

I. Whether the ALJ's "Step 5" sequential evaluation was unsupported because the vocational expert's ("VE") testimony conflicted with the Dictionary of Occupational Tasks ("DOT") and the ALJ's questioning of the VE did not fully account for Plaintiff's limitations.

II. Whether the ALJ erred by failing to fully account for Plaintiff's subjective reports of migraine headaches in her residual functional capacity ("RFC") statement, particularly that Plaintiff reported missing on average one day of work per month due to migraine headaches.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. First, the ALJ noted that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 1, 2012. (Tr. 25). The ALJ then found that Plaintiff had the following severe impairments: lumbar arthropathy with chronic lumbosacral pain syndrome; migraine headaches; autism spectrum disorder with sensory processing symptoms; attention deficit hyperactivity disorder ("ADHD"); major depressive disorder; and generalized anxiety disorder. (Tr. 26). The ALJ noted that "the claimant's impairments are severe because they cause more than slight or minimal limitations in the claimant's basic work-related activities." *Id.* The ALJ also found that Plaintiff carried less significant impartments of mild osteoarthritis of the right talonavicular joint; minimal cervical spondylosis; allergic rhinitis and obesity. *Id.* However, she noted that the evidence "fail[ed] to establish these conditions or their underlying symptoms meet a durational requirement, have not been responsive to treatment, and/or cause more than minimally vocationally relevant limitations." *Id.*

Although Plaintiff suffered from severe impairments, the ALJ determined that

these impairments and the combination of impairments did not meet or medically equal the severity of the listed impairments in 20 C.F.R. § 404. (Tr. 27-29). Regarding Plaintiff's migraine headaches, the ALJ noted that "the objective record does not show that the claimant's migraine headaches occur with the required intensity or frequency to support finding that the claimant medically equals listing 11.02 – Epilepsy, the closest analogous listing. In evaluating this condition, I have adhered to the guidelines set forth in SSR 19-4p." (Tr. 27).

The ALJ also found that "the severity of claimant's mental impairments and conditions considered singly and in combination, [did] not meet or medically equal the criteria listings 12.04, 12.06, 12.10 or 12.11." (Tr. 28). The ALJ proceeded to analyze the various aspects of claimant's mental impairments, including her ability to understand, remember or apply information (mild limitation), interacting with others (moderate limitation), concentration, persistence or maintaining pace (moderate limitation), and adaption and managing oneself (moderate limitation). *Id.* at p. 28-29. Because the claimant's mental impairments did not contain at least two "marked" limitations or one "extreme" limitation, the Paragraph B criteria were not satisfied. The ALJ also concluded that the Paragraph C criteria were not satisfied, as the Plaintiff's mental disorders were not "serious and persistent." *Id.* at p. 29.

Next, the ALJ found that Plaintiff has the RFC "to perform medium work as defined in 20 CFR § 404.1567(c) and § 416.967(c), except that she can occasionally climb ladders, ropes, and scaffolds and can occasionally climb ramps and stairs." (Tr. 29). The ALJ specifically noted that:

> The claimant can engage in occasional stooping, crouching, and crawling. She must work in an environment where the noise level is no more than 3-moderate and where the lighting is not brighter than typical office or warehouse. The claimant is limited to no more than occasional overhead reaching bilaterally, and she cannot perform work involving vibration, such as would be required by the operation of heavy equipment drills, jackhammers, or other such devices. She can maintain the concentration required to perform simple routine tasks, remember work procedures, and make simple work-related decisions. She cannot work at a fast pace such as an assembly line but can stay on task and meet reasonable production requirements in an environment that allows her to maintain a flexible and goal-oriented pace. The claimant is further limited to work that requires only occasional changes in the work setting which are introduced gradually. She can have occasional interaction with co-workers and supervisors but no interaction with the public.

(Tr. 29-30). In coming to this conclusion, the ALJ considered testimony from Plaintiff and her friend - Paul Zimmerli. The ALJ also considered medical source statements from Christine Diekman, O.T.R./L[2] and Melissa West, M.D.[3] addressing the claimant's mental impairments. (Tr. 33, 36). Further, the ALJ reviewed assessments of the evidence of the claimant's mental impairments conducted by Howard Tin, Psy. D., M.W. DiFonso, Psy. D., and Lenore Gonzalez, M.D. [4] The ALJ also included an analysis of Plaintiff's medical

---

[2] The ALJ noted that Ms. Diekman is not an acceptable medical source pursuant to the regulations. (Tr. 33). However, the ALJ indicated that "Ms. Diekman's opinions of marked limitations are inconsistent with the record, as set out above." *Id.*

[3] Dr. West submitted a statement dated October 23, 2019, that the claimant is disabled and would benefit from a Service Dog. The ALJ noted that this statement is not persuasive because the issue of the claimant's "disability" is reserved for the Commissioner. Additionally, the ALJ noted that Dr. West did not offer vocational limitations in this statement. (Tr. 35).

[4] Dr. Gonzalez conducted her review "at the request of the state agency." (Tr. 35).

records documenting her migraine headaches and physical impairments,[5] as well as treatment records for her mental impairments.

Lastly, the ALJ found that claimant is unable to perform any past relevant work. (Tr. 36-37). Ultimately, the ALJ found that, in line with testimony provided by the vocational expert, that Plaintiff "would be able to perform the requirements of representative medium, unskilled, SVP 2 occupations such as: machine feeder, hand packager, and laundry worker." *Id.* at p. 37-38.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the issues raised by Plaintiff.

**1.     Evidentiary Hearing**

An evidentiary hearing was held on October 19, 2021, in St. Louis, Missouri (Tr. 47). Plaintiff was represented by an attorney, Alan Dewoskin. *Id.* At this hearing, Plaintiff testified, as did her friend Paul Zimmerli. *Id.* The vocational expert ("VE"), Susan Shea, M.S., C.R.C., also testified.

---

[5]     Travis Isaak, D.C. submitted a letter outlining treatment Plaintiff received for low back and hip pain. However, the ALJ indicated that "Dr. Isaak is not an acceptable medical source pursuant to the regulations. Accordingly, his statement is considered but not analyzed; furthermore, he did not offer any opinions." (Tr. 34).

A.      *Plaintiff's Testimony*[6]

Plaintiff testified that she had difficulty completing her bachelor's degree due to issues with sensory overload and panic attacks. (Tr. 59). She indicated that she has seen "lots" of therapists and psychiatrists to address her mental health conditions, beginning at age 17. (Tr. 61). Around 2012, she began seeing massage therapists and chiropractors for her back pain. *Id.*

Plaintiff worked at St. Louis Screw and Bolt from February 2012 to August 2013. (Tr. 64). While employed there, Plaintiff began to experience pain in her hands, neck, and headaches. (Tr. 67). Plaintiff reported that she did not "realize migraines were . . . something the doctor would treat until [she] had a really bad one in Wisconsin and went to the ER" and that before then she would "just take Excedrin" and "tough it out." (Tr. 68). During this time, Plaintiff reported experiencing migraine headaches "at least once a month at work, but two or three a month at home, like around the weekend or something." *Id.* at p. 69. Plaintiff stated that she could not work while she was experiencing migraines and that she would "have to stay in . . . a dark room and try to sleep them off." *Id.* She indicated that her former lab work environment, was "really bright and loud." *Id.* Plaintiff also noted that once a month she experienced a migraine that prevented her from going to work. *Id.*

---

[6]     Plaintiff's counsel did not review all her psychological reports in the record during the direct examination. (Tr. 89). The ALJ noted that she "read every single page of every document in the file" and that Plaintiff's counsel did not need to go through the documentation as part of Plaintiff's direct examination. *Id.*

Plaintiff also spoke about how she was often "worn out." (Tr. 70). She reported that she often needed several days to recover from socializing, and eventually she would "hit a wall where [she couldn't] work anymore and quit." *Id.* Plaintiff stated she could rarely hold onto a job for over a year because she would get "burnt out and quit." *Id.* at p. 71. Plaintiff reported that sensory overload "cause[d] her to get worn out faster, especially if there's other sensory input that adds to it." *Id.* at p. 72. Bright lights negatively impacted her energy, and she wore headphones to limit the amount of noise she heard around her. *Id.* Plaintiff also reported that vibrations negatively affect her. *Id.* at p. 88. Plaintiff indicated that she grew exhausted from sensory overload because her "brain doesn't prioritize sounds, so it hears everything at the same volume." *Id.* at p. 85. Since she was fifteen, she had complained to doctors about experiencing chronic fatigue, but no additional tests were performed after the thyroid levels came back as normal. *Id.* at p. 76.

Plaintiff recounted her mental health treatment from Dr. Abrahamson. (Tr. 71). Abrahamson was Plaintiff's therapist from 1999 until 2017. *Id.* Plaintiff noted that Abrahamson's records reflected her difficulties with mood, social functioning, stress, energy, and motivation. *Id.* Plaintiff then began to see "Elana" at the CRC for her mental health treatment because Abrahamson did not specialize in autism or trauma. (Tr. 74-75).

After Plaintiff left her job at St. Louis Screw and Bolt, she began working as a cashier and stock clerk at Schuette's Market. (Tr. 75). Plaintiff reported that the job "aggravated [her] back quite a bit" and that she had to stop working for a month to keep from reinjuring it. *Id.* Plaintiff also noted that she would take the winter months off to

take her RV down to Florida to sell her artwork, but that selling her art did not amount to a profitable business. *Id.* at p. 75-76.

Plaintiff then began to elaborate on her anxiety, piriformis syndrome, and depression. (Tr. 78). Plaintiff indicated that these conditions affect her memory. *Id.* Plaintiff noted that her working memory (short term memory) is "terrible", but that her long-term memory is "better." *Id.* Plaintiff indicated that her executive function is affected by autism, and she reported that she often loses her keys and credit cards and forgets to pay bills. *Id.* at p. 86-87.

Plaintiff testified that due to her back pain, she has the assistance of a home health aide who cleans, schedules her medical appointments, conducts meal preps, shops for groceries, assists with the care of her two dogs, and helps with her laundry on occasion. *Id.* at p. 80-81.

Plaintiff also spoke about experiencing "crying spells and meltdowns" from the stress and being "so exhausted and worn down." (Tr. 84). She reported "crying uncontrollably" and "curling into the fetal position" from the exhaustion of experiencing anxiety and depression and dealing with sensory processing issues. *Id.* p. 84-85. Plaintiff also complained about the ill effects of "masking" her autistic symptoms to appear as normal as possible. *Id.*

The ALJ also asked Plaintiff some questions regarding her volunteer work and educational experience. (Tr. 88-91). Plaintiff noted that she served as a court appointed youth guardian from October 2017 to the summer of 2018. *Id.* at p. 90. She had to stop serving as a court appointed advocate because "she wasn't functioning" and was

"exhausted all the time." *Id.* Plaintiff also taught art classes for homeschool children in March 2019. *Id.* Plaintiff reported that she had taught two or three classes of three to five students once a week during the school year. *Id.* The class sessions lasted for one hour each. *Id.* Lastly, Plaintiff spoke on her acceptance into the Fine Arts master's Program at Washington University. *Id.* Plaintiff ultimately did not attend the program due to financial constraints. *Id.* at p. 91.

In response to the VE's testimony, Plaintiff indicated that she did not believe she could serve as a laundry worker because of her back pain. (Tr. 112). She noted that she has someone come in to assist her with her own laundry. *Id.* Additionally, Plaintiff disputed her ability to complete "light repetitive tasks." *Id.* Plaintiff indicated that her executive disfunction made it very difficult for her to engage in overly simplified tasks. *Id.* at p. 113. Plaintiff recounted an incident where she forgot about boiling eggs on the stove and that the eggs burned in the pot. *Id.* As a result, Plaintiff now uses a machine to boil her eggs. *Id.*

  B. *Testimony of Susan Shea, M.S., C.R.C.*

Ms. Shea began her testimony by classifying Plaintiff's previous employment experiences. Shea noted that Plaintiff's former experience as a purchasing assistant (DOT # 249.367-044) is classified as sedentary work; semi-skilled work, with an SVP of 4. (Tr. 104). Shea also classified Plaintiff's prior experience as a lab assistant (DOT #078.381-014) as light work; skilled work, with an SVP of 5. *Id.* at p. 104-105.

The ALJ then requested that Ms. Shea assess Plaintiff's vocational opportunities considering her age, experience, and education. (Tr. 105). The ALJ also laid out Plaintiff's

limitations as follows:

> [W]e're going to start at the medium exertion level occasional ladders, ropes, and scaffolds; . . . occasional ramps and stairs; . . . occasional stooping, crouching, and crawling. Work must be in an environment where the noise level is no more than 3, which is moderate; must work in an environment where the lighting is not brighter than the typical office or warehouse; limited to no more than occasional overhead reaching . . . bilaterally; no work that involves vibration, such as would be required by the operation of heavy equipment, drills, jackhammers, or other such devices. Then we have some mental limitations . . . can maintain the concentration required to perform simple routine tasks, remember work procedures and make simple work-related decisions' cannot work at a fast pace, such as on an assembly line, but can stay on task and meet reasonable production requirements in an environment that allows the individual to maintain a flexible goal oriented pace; limited to work that requires only occasional changes in the work setting which are introduced gradually; occasional interaction with co-workers and supervisors, and no interaction with the public.

(Tr. 105-106). Based on the ALJ's finding of Plaintiff's limitations, Ms. Shea concluded that Plaintiff would not be able to perform her past work. *Id.* at p. 106. However, Shea noted that there are other work opportunities that would be available to Plaintiff given her limitations. *Id.* Ms. Shea noted that Plaintiff would be able to work as a machine feeder at the medium level (DOT # 699.686-010) and that there were at least 50,000 jobs available in the national economy. *Id.* at p. 106-107. Shea also found that Plaintiff could work as a hand packager (DOT # 920.587-018) with 15,000 jobs available nationally. *Id.* at p. 107. Additionally, Shea found that Plaintiff would be able to work as a laundry worker (DOT # 361.685-018) with 35,000 jobs available nationally. *Id.*

Ms. Shea indicated that her findings were consistent with the DOT but noted that the DOT does not address overhead reaching, as opposed to reaching in all directions and that the DOT does not address interactions with others. (Tr. 108). She clarified that

she based her assessment, accounting for these specific alterations, with her "experience of well over 25 years of doing onsite job analyses; doing placement services; and reviewing current vocational research and literature." *Id.*

The ALJ then queried Ms. Shea as to whether additional jobs would be available to Plaintiff at the light exertional level. Ms. Shea noted that Plaintiff could work as a light cleaner or housekeeper (DOT # 323.687-014) which is classified as unskilled work with an SVP of 2 with 70,000 jobs in the national economy. (Tr. 108-109). Ms. Shea also noted that Plaintiff could find work as a light assembly production (DOT # 706.687-010) which is also classified as unskilled work with an SVP of 2 with at least 50,000 jobs in the national economy. (Tr. 109). Shea listed light hand cleaner (DOT # 709.687-010) as an additional possible job opportunity for Plaintiff with at least 20,000 jobs in the national economy. *Id.*

The ALJ also engaged in the following exchange with Ms. Shea:

> ALJ: . . . Now if the individual could have no interaction with co-workers or the public, would there be any work available for somebody who had that limitation?
>
> VE: No there would not be.
>
> ALJ: All right. And if the individual was going to be off task for 20% of the workday or absent two or more days per month, would there be any work available for somebody with either of those limitations?
>
> VE: No there would not be.

(Tr. 110-111). Shea noted that the DOT does not address any of those specific questions, but that her testimony on these issues was based on her relevant experience. *Id.* at p. 111.

Plaintiff's Attorney, Mr. Dewoskin, also took the opportunity to question Ms.

Shea. (Tr. 111-113). Mr. Dewoskin asked Ms. Shea for the jobs she had listed, if any of them would allow a person to leave the job area irregularly beyond normal job breaks. *Id.* at p. 111. Shea responded that if an individual left on a continuing basis for more than the two extra breaks supplied, they would be terminated after a short period of time. *Id.* at p. 111-112. She noted that this would eliminate all the jobs she had listed as available to Plaintiff. *Id.*

2.  **Plaintiff's Medical Records**

    A.  *Medical Statement – Christine Diekman*

    Christine Diekman, OTR/L., submitted a Medical Statement Regarding Autism and Related Disorders for Social Security Disability Claims on Plaintiff's behalf on September 8, 2018. (Tr. 681-683). Diekman noted that Plaintiff experiences the following symptoms: qualitative deficits in reciprocal social interactions; markedly restricted repertoire of activities and interests; marked restriction of activities and interests; marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. (Tr. 681).

    Diekman indicated that Plaintiff's work limitations related to her psychiatric state were "moderately limited "as to her: ability to understand and remember simple instructions, ability to carry out very short and simple instructions, ability to carry out detailed instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration for extended periods of time. (Tr. 681). Diekman also noted that Plaintiff's work limitations related to her psychiatric state were "markedly limited"

as to her: ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to sustain an ordinary routine without special supervision, ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 81-82).

Diekman concluded her statement by writing that Plaintiff "has a significantly more low registration, sensory sensitivity, and avoidance than most people . . . she presents with moderate to severe sensory dysfunction ("SPD"). [She] is coming weekly for therapy in sensory gym." (Tr. 82).

   B.   *Agency RFC Assessment*

Dr. Howard Tin, PSY D., conducted a Mental Residual Functional Capacity Assessment on Plaintiff on May 22, 2019. (Tr. 130). In Dr. Tin's explanation of his RFC assessment, he noted that "[c]laimant can remember locations or work-like procedures and can also understand and remember short simple instructions although the individual has difficulty remembering detailed instructions." *Id.* at p. 129. Regarding Plaintiff's sustained concentration and persistence, Tin explained that "[c]laimant can carry out short and simple instructions but collateral claims that claimant has a short attention span of about 15 minutes, cannot complete tasks and has problems following spoken and written instructions. . . . Claimant's memory skills and judgment and insight were noted to be less than adequate." *Id.* In the section assessing Plaintiff's adaptations, Tin stated that "claimant is capable of performing one and two step tasks." *Id.* at p. 130.

Dr. M.W. DiFonso, PSY D., conducted a Mental Residual Functional Capacity Assessment on Plaintiff on February 10, 2020. (Tr. 160). DiFonso similarly noted that

"[c]laimant can remember locations or work like procedures, and can also understand and remember short simple instructions, although the individual has difficulty remembering detailed instructions." *Id.* at p. 166. Concerning her sustained concentration and persistence, DiFonso noted that "[c]laimant can carry out short and simple instructions" but has a short attention span of about 15 minutes. *Id.* DiFonso also reported that "[c]laimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however . . . is capable of performing simple tasks." *Id.* DiFonso also noted, when assessing Plaintiff's adaption, that she is "capable of performing one and two-step tasks." *Id.* at p. 166.

## Discussion

Plaintiff alleges that the ALJ's finding at step five of the sequential evaluation was unsupported because the vocational expert's testimony conflicted with the Dictionary of Occupational of Titles ("DOT") and that the vocational expert did not account for Plaintiff's limitations under her RFC. (Doc. 24, p. 4). Defendant asserts that even if this were the case, the ALJ's error is not reversable because it was harmless as the vocational expert cited to other jobs available to Plaintiff that would meet her RFC. (Doc. 31, p. 8). Ultimately, the Court finds there is reversible error because it is unclear whether the ALJ evaluated the state agency psychologists' determinations that she should be limited to "one and two step tasks" when determining her RFC. This impacted the ability of the ALJ to assess the vocational expert's testimony when she proposed jobs available to Plaintiff within her RFC. As such, the Court reverses and remands the case to the agency consistent with the discussion below.

Dr. Howard Tin and Dr. M.W. DiFonso, both medical consultants employed by the agency, noted that "[c]laimant is capable of performing one and two-step tasks." (Tr. 130, 166-167). However, the ALJ's RFC assessment noted that Plaintiff "can maintain the concentration required to perform simple routine tasks, remember work procedures, and make simple work-related decisions." The ALJ in the case at bar acknowledged that the agency doctors limited Plaintiff to "one and two step tasks." (Tr. 34). Further, she noted that Dr. DiFonso and Tin's assessments were:

> . . . generally persuasive; specifically, they are familiar with Social Security rules and regulations, and their findings are both well supported by a detailed narrative analysis encompassing all evidence available at the time of their review and consistent with some examinations.

(Tr. 35). Based on the ALJ's assessment of Dr. DiFonso and Tin's evaluation, the ALJ found their reports generally persuasive. But it is not altogether clear whether the ALJ agreed with them that Plaintiff should be limited to "one and two step tasks." Determining whether she did so is critical in ascertaining whether a mistake was made, and further whether the vocational expert's testimony accurately reflected the job availability in accordance with Plaintiff's RFC.

When an ALJ rejects a state agency psychologist's opinion that a claimant is limited to one to two step tasks, an ALJ is required to "provide a thorough and appropriate explanation" for rejecting their assessment. *See Michael S. v. Saul*, No. 19-cv-4033, 2020 WL 4052903, at *4 (N.D. Ill. July 20, 2020). Further the ALJ must "build a logical bridge from the evidence to his conclusion that the Claimant should not be limited to one to two step tasks." *Mack v. Berryhill*, No. 16 CV 11578, 2018 WL 3533270, at *3 (N.D. Ill.

July 23, 2018). Merely mentioning the one to two step task limitation is not the same as fully addressing and analyzing the suggested limitation. *See, e.g.*, *Anne-Marie L. v. Kijakazi*, Case No. 3:21-cv-50354, 2022 WL 4610120, at *5 (N.D. Ill. Sept. 30, 2020) (stating that "[a]lthough the ALJ acknowledged the state agency physicians' finding in his decision, he did not include a restriction for one-to-two step tasks in the RFC and failed to explain why such a limitation was not included."). In this case, the ALJ did not provide any explanation concerning her apparent rejection of the one to two step task limitation and did not provide the requisite explanation necessary to establish a logical bridge. *See Fatime I. v. Kijakazi*, No. 20 CV 3603, 2022 WL 4605081, at *4 (N.D. Ill. Sept. 30, 2022). The lack of clarity regarding Plaintiff's ability to complete tasks complicates the Court's understanding of the ALJ's assessment of the vocational expert's testimony.

The DOT, on which Defendants must rely to analyze Steps 4 and 5 of the ALJ's sequential evaluation makes a distinction between "simple one or two step tasks" and "unskilled jobs," described as "detailed but uninvolved instructions." The GED scale, contained within the DOT, evaluates aspects of the Claimant's education which are required for satisfactory job performance. DOT, Appendix C, III. This scale is divided into three divisions: Reasoning Development, Mathematical Development, and Language Development. *Id.* Level 1 and Level 2 Reasoning Development are defined accordingly:

> 1 LEVEL REASONING DEVELOPMENT (R1) Apply commonsense understanding to carry out *simple one- or two-step instructions*. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> 2 LEVEL REASONING DEVELOPMENT (R2) Apply commonsense understanding to carry out *detailed but uninvolved* written or oral

instructions. Deal with problems involving a few concrete variables in or from standardized situations.

*Id.* (emphasis added). The ALJ cited to three available jobs for Plaintiff provided by the vocational expert– a machine feeder (DOT Code 699.686-010), a hand packer (DOT Code 920.587-018) and a laundry worker (DOT Code 361.685-018). Both hand packer and laundry worker jobs require a GED R2, which requires that Plaintiff do more than one to two step tasks. While machine feeder is defined as GED R1, this job suffers from another issue – the job requires the claimant to have the ability to tolerate a noise intensity of 4. Here, the ALJ stated that Plaintiff may only tolerate a noise level of 3. Thus, all three jobs cited to in the ALJ's decision potentially conflict with Plaintiff's RFC. Accordingly, the Court remands and reverses the decision.

As the Court has found that the ALJ committed error regarding Plaintiff's complaints and symptoms that requires remand, the Court need not address Plaintiff's remaining argument. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** for rehearing and consideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

DATED: March 28, 2024.

Digitally signed by
Judge Sison
Date: 2024.03.28
12:04:15 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**